John PAYNE, Maxine Payne, Wilbur C. Askew, Pari-Mutuel Revenue For a Better Missouri and Karen Schafer, Respondents-Relators-Plaintiffs,

v.

Hon. James C. KIRKPATRICK, Secretary of State of the State of Missouri, Appellant-Respondent-Defendant,

and

Gary D. Collins, Appellant-Intervenor-Respondent-Defendant.

No. WD 36365.

Missouri Court of Appeals, Western District.

Dec. 11, 1984.

As Modified Jan. 29, 1985.

Motion for Rehearing and/or Transfer to Supreme Court Overruled and Denied Jan. 29, 1985.

Application to Transfer Denied April 2, 1985.

Edward D. Robertson, Asst. Atty. Gen., Jefferson City, for James C. Kirkpatrick.

William Duane Benton, Jefferson City, for Gary Collins.

George Alex Bartlett, Jefferson City, for John Payne, et al.

Before TURNAGE, C.J., and SHANGLER and MANFORD, JJ.

MANFORD, Judge.

This is an action in mandamus seeking to compel the Missouri Secretary of State to place, for popular vote, a proposed constitutional amendment on the ballot for November 6, 1984, which, if approved, would permit and allow pari-mutuel wagering on horse racing. The circuit court, by its judgment in the form of an order, directed the Missouri Secretary of State to in turn direct local election authorities to place the proposal on the ballot for the November 6, 1984 general election. An appeal from that judgment was presented to this court. The judgment is affirmed.

While at the outset there was disagreement, and perhaps some confusion, as to whether this court has jurisdiction of this matter, it is quite clear from a review of Mo.Const.Art. V, § 3 (as amended, 1982) that the subject matter herein is not within the exclusive appellate jurisdiction of the Missouri Supreme Court and therefore jurisdiction is vested in this court. *Yes to Stop Callaway Committee, et al. v. Kirkpatrick*, 685 S.W.2d 209 (Mo.App.1984).

The facts, other than those directly related to the issues on this appeal, are quite simple and not disputed between the parties. They are, therefore, summarized. As to any other facts, they are specifically considered in the disposition of the charged errors infra.

This matter arose over the presentment of initiative petitions by respondents to the Missouri Secretary of State on July 5, 1984. Following the presentment of the petitions, the Secretary, after forwarding copies of the petitions to local election authorities for the verification of signatures, announced there was an insufficient number of signatures. This announcement was made on September 13, 1984. The Secretary stated that of the 208,060 submitted signatures, 137,840 were verified by local election authorities. The Secretary also announced that the petitions qualified in only four of the seven congressional districts involved. Specifically, the Secretary declared that the Second Congressional District failed to have the requisite number of valid signatures by 3,204, the Third Congressional District failed by 213, and the Seventh Congressional District failed by 843. Later the same day (September 13, 1984), respondents caused to have served upon the Secretary an alternative writ of mandamus and a petition for a writ of mandamus. The circuit court granted the alternative writ of mandamus, which directed the Secretary to either certify the petitions showing a sufficiency as to signatures or to show cause why the petitions were insufficient. On September 25, 1984, an evidentiary hearing was held and appellant-intervenor was allowed to intervene. At the

completion of the hearing, the circuit court issued its order pendente lite, directing the Secretary to place the proposal on the November 6, 1984 ballot. The order pendente lite was to remain in effect until October 27, 1984. At the evidentiary hearing, evidence was submitted by stipulation. On September 25, 1984, the circuit court made an entry on its docket sheet stating, "Case Under Advisement." On September 27, 1984 and September 28, 1984, respondents filed pleadings with the circuit court captioned "Redesignation of Petition Sheets." More about this matter is disclosed infra. On October 2, 1984, the circuit court issued its order as noted above. This appeal followed.

In total, appellants (Secretary of State and Intervenor) present ten alleged errors. Since there is some duplication and overlapping of these ten points and for the purpose of the disposition of this appeal, those points have been combined and summarized as follows.

Appellants charge that the trial court erred in (1) declaring that § 116.140, RSMo 1978 requires the Secretary of State to strike all names not counted by election authorities within 30 days of the receipt of the petitions or else all signatures must be counted as valid; (2) declaring that the petitions contained a sufficient number of valid signatures within the Seventh Congressional District, (3) allowing respondents to redesignate the county on certain petition pages because such redesignation subverts § 116.060, RSMo 1978, (4) in counting as valid certain signatures where there existed a variation in the addresses on the petitions as compared with registered voter records, (5) declaring that the initiative petition may be used to authorize pari-mutuel wagering because Article III, § 51 limits such use of initiative petitions; (6) ruling that the petitions were constitutional because they violate Mo.Const.Art. III, § 50, because notice is not given relative to the enactment of a new section, 39(a) and the effect is to repeal the present section 39(a)

presently authorizing bingo, and (7) ruling that the proposed amendment is constitutional because it contains more than one subject matter, and proposed amendments to more than one article of the constitution are in violation of Mo.Const.Art. III, § 50 and Art. XII, § 2(b).

It is to be noted from the outset that the decision of this court in affirming the judgment rests upon point (2) above. The remainder of the charged errors are considered solely due to their being presented and do not, as observed infra, weigh in the final disposition of this appeal.

Before addressing the specifically charged errors, some prefatory remarks are in order. Mo.Const.Art. III, § 50 (1945) provides that initiative petitions shall be submitted to the Secretary of State "not less than four months before the election ..." In the instant case, the petitions were filed exactly four months prior to the general election. Perhaps some thought might be in order to such filing some six months prior to the election. The reason for this thought is the extremely limited time placed upon the courts if and when a proposal is challenged by opponents of the measure. A longer prescribed time would enable our courts to give greater in-depth consideration of all the views of all parties interested in the measure. As it now stands, our courts are placed under such a time constraint and that, coupled with the immediacy of the situation, requires a resetting of dockets along with a number of other procedural and administrative problems that a longer time-period would avoid; not only a more orderly consideration of any such proposal, but more time for our courts to consider all attending ramifications of any such proposal. In addition, the Missouri General Assembly, because of the same problems as noted just previously, should explore changes within Chapter 116, RSMo 1978 which would directly define a time-period for certification by the Secretary of State, plus a statutory time limitation within which any challenge to such a

proposal must be made. This change would further enhance the court's opportunity to judicially review the various viewpoints free of the rushed and frenzied consideration of basic constitutional and legal questions which now attend any judicial review of such proposals. It would also permit review by the Supreme Court.

In addition, it should be made quite clear that the decision herein rests solely upon the factual and legal disputes raised by this case. This court must and has considered this matter completely detached from any attitude in support of or any attitude in opposition to the measure proposed herein. This court, in order to maintain its proper position within our system, must always and continues to render its decisions in such a detached atmosphere. It remains for the people through their vote and the proponents and opponents through their chosen media of expression to decide and discuss the economic, social and moral implications of such a proposal and its effect upon our state as a whole.

Under point (1), appellants charge that the trial court erred in declaring that § 116.140 requires the Secretary of State to strike names not counted by election authorities within 30 days of the receipt of the petitions or else all signatures must be counted.

This court concludes that appellants are correct in their assertion that the trial court erred in its interpretation of § 116.-140. The reason that the trial court erred is that § 116.140 has no application to the instant case. In considering this charged error, consideration must be given to § 116.130, RSMo 1978, as well as to § 116.-140. Section 116.130 reads:

**116.130. Verification of petitions, procedure—rules and regulations**

1. The secretary of state may send copies of petition pages to election authorities to verify that the persons whose names are listed as signers to the petition are registered voters. Each election authority shall check the signatures against voter registration records in his jurisdiction, but the election authority shall count as valid only the signatures of persons registered as voters in the county names in the circulator's affidavit.

2. If the election authority or the secretary of state determines that the congressional district number written after the signature of any voter is not the congressional district of which he is a resident, the election authority or the secretary of state shall correct the congressional district number on the petition page. Failure of a voter to give his correct congressional district number shall not by itself be grounds for not counting his signature.

3. The election authority shall return the copies of the petition pages to the secretary of state with annotations regarding any invalid or questionable signatures. He shall verify the number of pages received for that county, and also certify the total number of valid signatures of voters from each congressional district.

4. The secretary of state is authorized to adopt rules to insure uniform, complete, and accurate checking of petition signatures. Any rule or portion of a rule promulgated may be suspended by the joint committee on administrative rules if after hearing thereon the committee finds that such rule or portion of the rule is beyond or contrary to the statutory authority of the agency which promulgated the rule, or is inconsistent with the legislative intent of the authorizing statute. The general assembly may reinstate such rule by concurrent resolution signed by the governor.

5. After a period of three years from the time of submission of the petitions to the secretary of state, the secretary of state, if he determines that retention of such petitions is no longer necessary, may destroy such petitions or return them to the person submitting them upon

written request from such person. Returned petitions shall be stamped by the secretary of state to indicate that such petitions are no longer valid.

As can be observed, § 116.130.1 states that the Secretary of State *may* send copies of petition pages to *election authorities* for the purpose of verifying that those persons who are listed as signers on the petitions are properly registered voters. Further, as can be observed, under § 116.-130.3 the election authorities shall return the petition pages to the Secretary with annotations relative to the validity of any signature. The Secretary then is required to verify the pages of the petition returned for each county and further, he is to certify the total number of valid signatures from each of the congressional districts.

■ All that § 116.130 provides is an alternative method for the verification of signatures. It is an optional method left to the decision of the Secretary of State. The very use of the term *may* within that section describes the legislative intent that the Secretary is given such option.

In addition, within § 116.140, the Secretary is provided another option to the procedure permitted within § 116.130. Section 116.140 reads:

**116.140. Secretary of state may strike signatures he determines to be invalid—secretary may be compelled to show cause.**

Notwithstanding certifications from election authorities under section 116.-130, the secretary of state shall have authority not to count signatures on initiative or referendum petitions which are, in his opinion, forged or fraudulent signatures. In determining the validity of signatures, the secretary may consult public records, including voter registration records, for signature comparisons, and he may also rely on any certifications from election authorities on the matter. Names stricken from the petition lists for the reason of forgery or fraud shall be stricken within thirty days of receipt of the petition lists by the secretary of state, and shall be so noted on the petition and within three days of determining which signatures should not be counted, the secretary of state shall send by certified mail a list of those not counted because of apparent forgery or fraud or failure to comply with section 116.060 to the person whose name and address are designated under section 116.100, informing him that those signatures will not be counted. Within ten days after receiving such a notice from the secretary of state, the person submitting the petition may bring an action in the circuit court of Cole County to compel the secretary of state to show cause why the names were stricken. If the secretary of state does not give notice as required by this section, his action in striking those signatures from the petition shall be void.

■ As can readily be observed under the foregoing statutory section, the Secretary is authorized *not* to count certain signatures. Unlike § 116.130, § 116.140 sets forth certain requirements which must be met if the Secretary opts to strike names from the petition lists. If he takes such action, he has thirty days within which this must be done. In addition, he must send by mail a list of those names stricken to the person or persons to whom notice is to be given pursuant to §116.100, RSMo 1978. The requirements prescribed by § 116.140 clearly apply only to acts committed by the Secretary. When § 116.130 and § 116.140 are read together, as they must be, it becomes obvious that two separate and different procedures relative to signature verification are provided. Words and terms within a statute must be accorded their plain and ordinary meaning. *State v. Burnau,* 642 S.W.2d 621 (Mo. banc 1982).

■ As it concerns the instant case, it is clear from the record that the Secretary took no action to strike signatures, and it must therefore follow that the 30-day time

limitation and notice are not applicable herein. Correspondingly, § 116.130 places no such time constraint or notice requirement upon local election authorities.

This court is at a loss to determine why the circuit court herein even undertook to rule the way it did regarding § 116.130 and § 116.140. Perhaps the harried fashion and time constraint created in these proceedings triggered the circuit court's action in this regard. Alternatively, perhaps the circuit court was uncertain as to the tabulation of valid signatures. It will perhaps never be known, but nonetheless it is of little significance as it regards the disposition of this appeal. The circuit court's ruling on the statute, as will be observed infra, has no controlling influence in this case, but since the precise issue was presented to this court, it becomes the duty of this court to discuss and rule the precise issue. The conclusion which must be reached is that the circuit court, under the particular facts and circumstances of the instant proceedings, erroneously interpreted and applied § 116.130 and § 116.140.

These two statutory sections perhaps need further consideration by the General Assembly and this court suggests a revision of both sections aimed toward a direct and clear definition of any time requirements upon either the local election authorities or the Secretary, along with what requirements, if any, are to be provided persons under § 116.110. Such a revision, it is hoped, would then advise the local election authorities and/or the Secretary of exactly what each can/may do and in addition, prescribe a definite time frame for those requirements to be met. Such a revision would prevent the post-action review, as in the instant case, to determine if the statute were even applicable. In this way, those involved in the initiative process, the local election authorities, the Secretary, and the courts would know precisely what each can and must do within a clearly outlined time network.

Turning to appellant's point (2), attention is focused upon the real dispositive issue in this case. Appellants charge that the trial court erred in declaring the petitions contained a sufficient number of signatures within the Seventh Congressional District.[1]

Before giving attention to the factual (i.e., mathematical factor) aspects of this issue, consideration must be given to certain basic constitutional provisions applicable to the issue.

The challenge made by the appellants includes reference to Article III, § 50, Article III, § 53, and as observed infra, of necessity, the issue also involves Article IV, § 18. These various sections read as follows:

**§ 50. Initiative petitions—signatures required—form and procedure**

Section 50. Initiative petitions proposing amendments to the constitution shall be signed by eight per cent of the legal voters in each of two-thirds of the congressional districts in the state, and petitions proposing laws shall be signed by five per cent of such voters. Every such petition shall be filed with the secretary of state not less than four months before the election and shall contain an enacting clause and the full text of the measure. Petitions for constitutional amendments shall not contain more than one amended and revised article of this constitution, or one new article which shall not contain more than one subject and matters properly connected therewith, and the enacting clause thereof shall be 'Be it resolved by the people of the state of Missouri that the Constitution be amended:'. Petitions for laws shall contain not more than one subject which shall be expressed clearly in the title, and the enacting clause thereof shall be 'Be it enacted by the people of the state of Missouri:'.

---

**1.** It is noted that initially there was a dispute over valid signatures within three congressional districts. The parties, by stipulation, resolved the dispute concerning two districts thus limiting the issue only to the Seventh Congressional District.

## § 53. Basis for computation of signatures required

Section 53. The total vote for governor at the general election last preceding the filing of any initiative or referendum petition shall be used to determine the number of legal voters necessary to sign the petition. In submitting the same to the people the secretary of state and all other officers shall be governed by general laws.

## § 18. Election returns—board of state canvassers—time of meeting and duties—requirement for election—tie votes

Section 18. The returns of every election for governor, lieutenant governor, secretary of state, state auditor, state treasurer and attorney general shall be sealed and transmitted by the returning officers to the secretary of state, who shall appoint two disinterested judges of a court of record of the state, and the three shall constitute a board of state canvassers. The board shall meet at the state capitol on, or at the call of the secretary of state before, the second Tuesday of December next after the election and forthwith open and canvass the returns of the votes cast and from the face thereof ascertain and proclaim the result of the election. The persons having the highest number of votes for the respective offices shall be declared elected, and if two or more persons have an equal and the highest number of votes for the same office, at its next regular session the general assembly, by joint vote and without delay, shall choose one of such persons for the office.

As regards Art. III, § 50, it is referenced merely to illustrate that in those instances involving a proposed constitutional amendment and a proposal of a law by initiative petition, the requisite percentage of signatures is 8% and 5% in each of two-thirds of Missouri's congressional districts. Those requisites are not in dispute. The parties also do not dispute that since Missouri currently has only nine congressional districts, the requisite two-thirds is 8% or 5% within each of six of the congressional districts.

As regards Art. III, § 53, there is a strong dispute between the parties. Appellants contend that the term *"total vote"* contained within that section means and equates with the term *actual votes cast* for the governor in the last preceding election. Respondent, on the other hand, contends that the term *"total vote"* means the number of votes cast and as proclaimed by the Board of State Canvassers and authorized within Art. IV, § 19.

An explanation of the facts herein is required and which in turn will illustrate the difference in the parties' positions on this issue. When respondents commenced the circulation of their petitions, they requested and received from the Secretary of State a certification of the votes cast within the Seventh Congressional District. They were advised that the total number was 233,079. Thus, when 8% is applied to that total number, the resulting number is 18,-646. When this was subsequently contested, it was determined that through an administrative oversight, and thus a mathematical miscalculation, an error of 4,808 votes was discovered. Stated another way, by *actual vote*, the total votes cast should read 237,887. It can readily be observed then that 8% of this new total would amount to 19,032.[2]

Thus, this court must determine what "total vote" means within Article III, § 53. There are no Missouri cases which have addressed or decided this question.

While appellants argue that "total vote" means "actual vote", respondents assert not only were they entitled to rely upon the vote proclaimed by the Board of Canvassers, but for purposes herein, that pro-

---

**2.** The actual calculation would be 19,031.96 and is thus rounded off to the next highest full number.

claimed vote is the "total vote" within the meaning of Article III, § 53. Referring to a general source on this subject, the following is found in 29 C.J.S. Elections § 237(4) (1965):

> Generally a declaration of the results of an election must be made by designated officers, usually the canvassing board, in the manner provided by law, and such declaration is binding on everyone as long as it stands unreversed by a proper judgment or decree.

Article IV, § 18 follows the above announced general principle.

It has been determined that the declaration of election results is administrative and not judicial. *McGary v. Barrows,* 156 Me. 250, 163 A.2d 747 (1960); *Fairfield-Suisan Sewer District v. Hutcheon,* 139 Cal. App.2d 502, 294 P.2d 102 (1956). It has also been determined that the validity of the declared (i.e., proclaimed vote within Article IV, § 18) vote is not subject to collateral attack. *State ex rel. Donnell v. Osburn,* 347 Mo. 469, 147 S.W.2d 1065 (1941). *Osburn* further declares at 147 S.W.2d 1068:

> We are convinced that the result as determined from the face of the returns was to be at least prima facie evidence of election. It follows then that the duties imposed by Section 3 are ministerial. [i.e., count of vote required by the Speaker of the House of Representatives] The winner as shown thereon was to be declared elected. If the election was to be contested such contest would be thereafter instituted and conducted as provided by law. We held official returns to be prima facie evidence of election and good until proven otherwise by contest in *State ex rel. Attorney General v. Vail,* 53 Mo. 97.

As a curious note, the circuit court herein, in its order and memorandum, relied upon *Vail* and declared that *Vail* held that the Governor "cannot look behind such an official canvass." While *Vail* does pertain to this issue, its application is more correct-ly noted in the above quote from *Osburn.* This distinction is made obvious from the following quote from *Vail* at 111:

> The question in this case is not, whether the Governor may go behind the certificate of the Secretary of State and look into the returns filed in that office to see if the certificate is warranted by these returns, or is false, but whether he can disregard both the certificates and the returns on file in the Secretary's office, and give the commission to the candidate
> . . .

While some may think the above is a distinction without substance, it was thought that the broad statement made by the circuit court in regard to *Vail* should be clarified.

As to the review of a vote canvass, additional reference to 29 C.J.S. Elections § 237(5) (1965) reveals there to be no inherent jurisdiction for review of such canvass by the courts. That is, absent either constitutional or statutory authorizations courts do not have the authority to sua sponte review the vote canvass. No such constitutional or statutory scheme is to be found under Missouri law.

Thus, in consideration of the term "total vote" as used and intended within Article III, § 53, and at the same time ruling against appellants on this point, the following conclusions must be reached.

■■■ "Total vote", as that term is intended within Article III, § 53, means that vote proclaimed by the Board of Canvassers after and as a result of the performance of the requirements prescribed in Article IV, § 18. Further, the vote as "proclaimed" by the Board of Canvassers shall be prima facie evidence thereof and the proclaimed results shall not be subject to any collateral attack, but rather, any attack on such vote shall be made in a separate proceeding directly contesting the validity thereof. Under the particular facts and circumstances herein, it is concluded that appellants' challenge to the "proclaimed

vote" is collateral in nature. This attack arose over two years following the general election from which the proclamation was made, and the error was discovered only upon the present contest being initiated. In that interval, reliance was made upon the proclaimed vote by respondents, and it is safe to presume such reliance was often made by others concerned with the finality of the vote.

Thus, "total vote" is construed to mean that vote proclaimed by the Board of Canvassers in the absence of a prompt and successful challenge to the proclaimed vote. Obviously, the matter is rendered moot if, on the other hand, there is a prompt and successful challenge to the proclaimed vote as that successful process would then, by a correction to the proclaimed vote, render the "total vote" the same as the "actual vote." Thus, respondents' challenge to the incorrect numerical proclamation of vote by the Board of Canvassers must fail.

■ Turning now to the evidentiary aspect of the issue after having shown the requisite number of names to be 18,646, this court would like to point out that while this matter was before this court, a careful and meticulous "recount" and analysis of the names within the Seventh Congressional District took place. There were submitted by the petition 27,201 names. Of that number, only 18,188 were verified. With that verification, it is obvious that there existed a shortage of 458 names below the required 18,646.

By way of an exhibit (Exhibit AH), respondents claimed that 857 names should have been counted and they were not counted by the Secretary. In addition, respondents introduced an exhibit (Exhibit AI) which listed some 790 names which in turn, respondents claim, should have been counted but were not counted by the Secretary.

This court has analyzed these exhibits. As to exhibit AH first, the circuit court found that 207 names were valid signatures of legal voters with each of them registered within the county designated on the particular sheet which the individual signed. After reviewing the exhibit, this court must agree with the circuit court's inclusion of these 207 names. Still, as regards Exhibit AH, the circuit court included "two hundred or more" names which reflected an identical name and address between the petitions and the voter registration records. Of this "two hundred or more", there were some names which had "inconsequential variations." These "inconsequential variations" were such things as the absence of a middle initial or the use of a "nickname" in lieu of a formal given name. The trial court concluded that these names should have been included, particularly when aided by the presumption of validity. After a careful review of Exhibit AH, this court cannot conclude that either the process or the result reached by the circuit court was in error. Thus, from AH, a total of 409 names should have been added. By calculation, then the petitions still fell short by 49 names.

When Exhibit AI was reviewed by this court, the conclusion reached by the circuit court in including an additional 52 names must be upheld. These 52 names were identical on the voter registration records and the petitions. Thus, the total of valid names after review by this court came to a total of 18,649. Stated another way, this court's review reveals that from Exhibits AH and AI, a total of 461 names should have been included. When this 461 number is added to the uncontested 18,188 figure, a total of valid signatures of 18,649 is derived.

In addition, there were 64 signatures which were "harmonized" by the Greene County Clerk as being the same or where the address contained only minimal variations. Thus, it is also correct to have included these 64 signatures or names, thus producing a final total of 18,713.

This tabulation excludes signatures or names accompanied by a wrong address,

duplications, a signature entered by a spouse and where the name was printed instead of given in cursive. All names within these categories are deemed invalid and could not and were not counted.

In addition, the above calculation did not include 245 names which were included by the circuit court in its "redesignation of the petition." That issue is discussed infra under point (3).

So, in conclusion, as it concerns appellants' point (2), said point must be ruled against appellants because of the following reasons.

"Total vote", as that term is used and intended within Article III, § 53 means, in the absence of a prompt, direct and successful challenge to the "proclaimed vote" of the Board of Canvassers as prescribed by Article IV, § 18, the vote "proclaimed" by the Board of Canvassers. Thus, the "total vote" in the instant case required to satisfy the 8% requirement under Article III, § 49 is 18,646. Further, the evidence as regards the signatures, as outlined above, establishes at least 18,649 valid signatures to which could have been added an additional 64, bringing the actual name total to 18,713. Appellants' point (2) must be held to be without merit and is ruled against them.

Under their point (3), appellants charge that the trial court erred in permitting respondents to redesignate their petition sheets. Again, as noted, this issue is not dispositive of this appeal, but is addressed because of the importance of the issue.

■ It should first be pointed out that this court does not agree that the approximate 60 names "added" by "redesignation" were necessary to reach the total requisite signatures to place the proposal on the ballot. By this court's counting process, the names "redesignated" were not counted by this court. Thus, what remains is the determination of whether the circuit court had authority to "redesignate" petitions.

What occurred was that a pleading was filed by respondents, asking permission to alter, amend, or redesignate certain petitions in order that the names thereon would coincide with the county of residence of the signers (some 60 total). The court allowed such designation upon respondent's claim of a scrivener's error.

The circuit court was without authority to "redesignate" the petitions. The petitions are evidentiary in nature and are not in the form of pleadings to which a trial court might act regarding alteration or amendment.

This court concludes that the assertion of appellants that the "redesignation" of petitioners subverts § 116.060, RSMo 1978 is correct. Section 116.060 reads:

**116.060. Initiative and referendum petitions, who may sign—residents of one county only on a page**

Any registered voter of the state of Missouri may sign initiative and referendum petitions. However, each page of an initiative or referendum petition shall contain signatures of voters from only one county. Signatures of voters from counties other than the one designated by the circulator on a given page shall not be counted as valid.

As noted above, the ruling on this point does not constitute grounds for reversal because the names affected by the "redesignation" were not included by the court within the "total vote" or total name calculation.

Nonetheless, the trial court did err in "redesignating" the petitions pursuant to respondents' request for same. Said act by the circuit court was in no manner authorized and in fact such action, since it violates § 116.060, is prohibited.

Under their point (4), appellants charge that the trial court erred in counting as valid certain signatures where there existed a variation in the addresses as compared with registered voters' records.

Appellants are correct that there existed some variations between the addresses on the petitions as compared with registered

voters' records. This court, in its review, discarded such names and while such variations did appear, they were insignificant in relation to the final count and did not affect the final outcome.

■ This precise issue was answered in this court's opinion in *Yes To Stop Calloway Committee v. Kirkpatrick, et al.*, 685 S.W.2d 209 (Mo.App.1984). Thus, signatures and addresses upon any initiative petition which, when compared with registered voters' records reflect a different address, are invalid and are not to be counted.

Under their point (5), appellants charge that the trial court erred in declaring that an initiative petition may be used to authorize pari-mutuel wagering because Article III, § 51 limits such use of initiative petitions. Section 51 of Article III reads:[3]

**§ 51. Appropriations by initiative—effective date of initiated laws-conflicting laws concurrently adopted**

Section 51. The initiative shall not be used for the appropriation of money other than of new revenues created and provided for thereby, or for any other purpose prohibited by this constitution. Except as provided in this constitution, any measure proposed shall take effect when approved by a majority of the votes cast thereon. When conflicting measures are approved at the same election the one receiving the largest affirmative vote shall prevail.

This court cannot agree with appellants' contention. The wording of § 51, in the first portion thereof, is limited to appropriation by the initiative petition. It is not that portion that appellants seek to have this court interpret, however. Appellants seized upon the language "or for any other purpose prohibited by this constitution."

After a well presented review of the development of language within our constitution, appellants ground their argument

upon Article III, § 39(9), which standing alone reads:

**§ 39(9)**

(9) To authorize lotteries or gift enterprises for any purpose, and shall enact laws to prohibit the sale of lottery or gift enterprise tickets, or tickets in any scheme in the nature of a lottery; except that, nothing in this section shall be so construed as to prevent or prohibit citizens of this state from participating in games or contests of skill or chance where no consideration is required to be given for the privilege or opportunity of participating or for receiving the award or prize and the term 'lottery or gift enterprise' shall mean only those games or contests whereby money or something of value is exchanged directly for the ticket or chance to participate in the game or contest. The general assembly may, by law, provide standards and conditions to regulate or guarantee the awarding of prizes provided for in such games or contests under the provision of this subdivision.

However, § 39(9) is preceded by § 39(1), which reads:

**§ 39(1).**

Section 39. The general assembly shall not have power:

(1) To give or lend or to authorize the giving or lending of the credit of the state in aid or to any person, association, municipal or other corporation;

■ Thus, by any fair interpretation or understanding, § 39(9) is within and subject to § 39 as a whole, which contains the limiting language that such prohibition is *only* applicable to the power of the Missouri General Assembly. It does not follow that such prohibitions, as found within § 39, applies to initiative petitions, particularly in light of the language contained within § 49 of Article III, which reads:

---

**3.** It is noted the trial court ruled this issue against appellants by declaring the issue not ripe for determination.

## § 49. Reservation of power to enact and reject laws

Section 49. The people reserve power to propose and enact or reject laws and amendments to the constitution by the initiative, independent of the general assembly, and also reserve power to approve or reject by referendum any act of the general assembly, except as hereinafter provided.

 Section 49 specifically distinguishes the reserved power of the people by initiative independent of the power of the Missouri General Assembly. When § 39 and § 49 are read together and harmonized, as they must be by this court, it must be concluded that reference with § 51, declaring "or for any other purpose prohibited by this constitution" does not apply or limit the reserved power of the people within § 49. It is noted that there is no other specific limitation within the constitution on wagering, except that set forth within § 39(9), and it must follow that § 51 finds application only to prohibitions set forth within § 39.[4]

If the people of this state wish to limit the use of the initiative, then attention must be directed to § 49 and such limitations must be enumerated therein or alternatively, the people should propose additional amendments to the constitution specifically declaring limitations upon the use and application of initiative petitions. As it currently is worded, the prohibition claimed by appellants is by the specific wording of § 39 limited to actions of the General Assembly and not to powers reserved to the people by virtue of § 49.

 Under their point (6), appellants charge that the trial court erred in ruling that the petitions were constitutional, because they violate Article III, § 50 of the Missouri Constitution because notice was not given relative to the enactment of a new § 39(a) and the effect is to repeal the present § 39(a) authorizing bingo.

4. It must be noted that § 39(9) was amended by the addition of § 39(a), authorizing bingo by

This court does not reach appellant's assertion as to whether former § 39(a), commonly referred to as the "bingo section" was by the enactment of pari-mutuel horse racing repealed. On the surface, it appears that bingo has, in effect, been repealed and is no longer authorized under Missouri law. This result appears possible because of the precise wording of the proposed amendment on pari-mutuel horse racing. The proposal makes no provision for the continuation or reenactment of bingo.

This court does not decide that issue because the question before this court is whether the proposed amendment adequately gave signers, and thus the voters, adequate notice of what it proposed for purposes of the proposal being placed upon the November 6, 1984 ballot.

A fair reading and interpretation of the proposed amendment does advise the people that Article III, § 39 is repealed and further that two new sections are enacted in lieu thereof. That suffices for purposes of the measure being placed upon the ballot for popular vote. It is noted that the bingo provision is repealed and not re-enacted, but a ruling on the precise question of whether bingo is repealed must await further action, if any, as the answer to that question is not necessary or before this court in the current proceedings.

 Under their final point (7), appellants charge that the trial court erred in ruling that the proposed amendment is constitutional, because it contains more than one subject matter and proposes amendments to more than one Article of the Constitution, in violation of Article III, § 50 and Article XII, § 2(b) of the Missouri Constitution:

## § 50. Initiative petitions—signatures required—form and procedure

Section 50. Initiative petitions proposing amendments to the constitution

voter approval on November 4, 1980.

shall be signed by eight per cent of the legal voters in each of two-thirds of the congressional districts in the state, and petitions proposing laws shall be signed by five per cent of such voters. Every such petition shall be filed with the secretary of state not less than four months before the election and shall contain an enacting clause and the full text of the measure. Petitions for constitutional amendments shall not contain more than one amended and revised article of this constitution, or one new article which shall not contain more than one subject and matters properly connected therewith, and the enacting clause thereof shall be 'Be it resolved by the people of the state of Missouri that the Constitution be amended;'. Petitions for laws shall contain not more than one subject which shall be expressed clearly in the title, and the enacting clause thereof shall be 'Be it enacted by the people of the state of Missouri:'.

### § 2(b). Submission of amendments proposed by general assembly or by the initiative

Section 2(b). All amendments proposed by the general assembly or by the initiative shall be submitted to the electors for their approval or rejection by official ballot title as may be provided by law, on a separate ballot without party designation, at the next general election, or at a special election called by the governor prior thereto, at which he may submit any of the amendments. No such proposed amendment shall contain more than one amended and revised article of this constitution, or one new article which shall not contain more than one subject and matters properly connected therewith. If possible, each proposed amendment shall be published once a week for two consecutive weeks in two newspapers of different political faith in each county, the last publication to be not more than thirty nor less than fifteen days next preceding the election. If

there be but one newspaper in any county, publication for four consecutive weeks shall be made. If a majority of the votes cast thereon is in favor of any amendment, the same shall take effect at the end of thirty days after the election. More than one amendment at the same election shall be so submitted as to enable the electors to vote on each amendment separately.

This court cannot agree with appellants' assertion that the proposed amendment contains more than one subject matter, nor that the measure proposes amendments to more than one article of the constitution. From and upon a fair reading and interpretation of the proposal, it must be concluded that it is directed to the voters, and if approved by them, authorizes pari-mutuel horse racing. First, it can be said there is no merit to appellants' contention that the proposal "by implication" repeals §§ 17, 18, and 19 of Article X of the Missouri Constitution (as amended 1980).

The proposal, after prescribing its terms and setting forth details of a racing commission, continues to thus define the appropriation of funds derived from pari-mutuel operations. Such provisions are within the language found in both Article III, § 50 and Article XII, § 2(b), both of which read, "... and matters properly connected therewith."

The proposal does not violate either Article III, § 50, nor Article XII, § 2(b).

Nothing has been presented to this court which persuades this court to conclude that the proposed amendment to the Missouri Constitution to authorize pari-mutuel horse racing must be denied placement upon the November 6, 1984 general election ballot. As to any and all other substantive matters, the answer lies in other properly instituted proceedings and this court neither reaches nor decides those issues.

Judgment affirmed.

SHANGLER, J., concurs.

TURNAGE, C.J., dissents in separate dissenting opinion.

TURNAGE, Chief Judge, dissenting.

I dissent because I do not believe the circuit court acquired jurisdiction to order the initiative in this case to be placed on the ballot. Although no party has raised the issue of jurisdiction, it is our duty to examine the jurisdiction of the circuit court sua sponte. *Justus v. Webb*, 634 S.W.2d 567, 568[2] (Mo.App.1982).

The initiative petition in this case was delivered to the Secretary of State on July 5, 1984. The Secretary sent copies of each petition page to local election authorities for them to check the petition signatures against voter registration records. Sometime prior to September 13, 1984, the Secretary received back all of the pages from the local election authorities and totaled the number of valid signatures. On September 13, the Secretary released a statement to the press that the petition did not have the required number of valid signatures to place the initiative on the ballot.

The same day, the officers of the committee supporting the initiative filed a petition in mandamus in the Circuit Court of Cole County. Also that day, an alternative writ of mandamus was served on the Secretary of State which directed the Secretary to either certify the petition as having a sufficient number of signatures to place the initiative on the ballot or to show cause why the petition did not contain a sufficient number of signatures. After a hearing, the court ordered the Secretary to place the initiative on the ballot.

Section 116.200, RSMo Supp.1984 provides that after the Secretary of State certifies a petition as sufficient or insufficient, any citizen may apply to the Circuit Court of Cole County to compel him to reverse his decision. The predecessor to § 116.200 was § 126.071, RSMo 1978, which stated that if the Secretary refused to file or certify any initiative petition, any citizen could apply to the circuit court for a writ of mandamus to compel him to do so. Section 126.071 was repealed by Laws of Mo.1980, p. 284, effective January 1, 1981, which is the date § 116.200 took effect.

I believe there are two reasons the circuit court did not have jurisdiction to order the Secretary to place the initiative on the ballot. First, § 116.150, RSMo Supp.1984 requires the Secretary to certify that the petition is sufficient or insufficient. In this case, the Secretary has yet to certify the petition as sufficient or insufficient, and in fact he had no opportunity to do so because of the filing of the writ of mandamus petition. While it may be argued that the Secretary's press release announcing that the petition was insufficient will suffice as a certification, the fact remains that he did not actually certify the petition as insufficient. Absent such a certification from the Secretary, there was no decision for the court to reverse under § 116.200. The court had nothing before it capable of adjudication and thus did not acquire subject matter jurisdiction.

There is a second reason the circuit court did not have jurisdiction. Section 116.200 permits any citizen to file a petition with the Circuit Court of Cole County to compel the Secretary to reverse his certification decision. The legislature repealed the use of a writ of mandamus for this purpose in 1980, and since that time no authority exists for the use of mandamus to compel the Secretary of State to certify an initiative petition as sufficient or insufficient. Absent a statute authorizing the use of mandamus in this case, it is clear that mandamus will not lie. Here, the writ was used to adjudicate the validity of the number of petition signatures. In *State ex rel. Summers v. Pletz*, 614 S.W.2d 559, 562[5] (Mo. App.1981), this court stated: "The function of mandamus is to enforce, not to establish, a claim or right; the office of the writ is to execute, not to adjudicate."

In this case, the writ clearly was used to adjudicate the question of the number of valid signatures, and thus to establish the right to have the initiative placed on the ballot. These are the very objectives which the writ of mandamus will not reach. Since January 1, 1981, the legislature has

prescribed a method for testing the Secretary's certification concerning whether or not the petition is sufficient or insufficient. That method provides simply for the filing of a petition to compel the Secretary to reverse his decision.

In *Gothard v. Spradling,* 586 S.W.2d 443, 445[1, 2] (Mo.App.1979) the court stated:

> Where the legislature is authorized to, and provides a method for review, failure to follow that procedure is jurisdictional. *Randles v. Schaffner,* 485 S.W.2d 1, 3 (Mo.1972). The General Assembly may very properly provide for specific review procedures in particular cases. *Blydenburg v. David,* 413 S.W.2d 284, 291 (Mo. banc 1967). The right of review is constitutional, but where the statute provides the remedy and the procedure to be followed, it must be complied with. *State ex rel. State Tax Commission v. Luten,* 459 S.W.2d 375 (Mo. banc 1970); *State v. Stanton,* 311 S.W.2d 137, 140 (Mo.App.1958). When a statute provides a special type of review it is exclusive so as to preclude the use of any other or nonstatutory method. *American Hog Company v. County of Clinton,* 495 S.W.2d 123, 127 (Mo.App.1973).

In my view the procedure followed in this case was wholly unauthorized by statute and in fact contrary to the limitations placed on the writ of mandamus. The statute provides a plain and simple method of review, but that procedure was not followed. The petition for mandamus was filed before the Secretary could certify the petition as sufficient or insufficient. That, plus the use of a proceeding wholly unauthorized by statute, leads me to conclude that the circuit court had no jurisdiction to order the Secretary of State to place the initiative on the ballot. I would reverse the judgment of the circuit court on the ground that the court had no jurisdiction in this case.