## P. L. COULTER V. THE STATE.

No. 15132. Delivered October 12, 1932.
Reported in 53 S. W. (2d) 477.

The opinion states the case.

*Mathis & Mathis* and *Berry & Berry,* all of Houston, and *Thompson & Barwise,* of Fort Worth, for appellant.

*Jesse E. Martin,* Criminal District Attorney, *Cecil Rotsch*

and *Stanley Bradford,* Asst. Criminal District Attorney, all of Fort Worth, and *Lloyd W. Davidson,* State's Attorney, of Austin, for the State.

MORROW, PRESIDING JUDGE.—Betting on a horse race is the offense; penalty assessed at a fine of twenty-five dollars.

A summary of the state's testimony is as follows: At Arlington Downs, on the 19th day of September, 1931, there were conducted seven horse races. One of these races was known as the "Futurity Race." In it eight horses were entered, two of which were later withdrawn. The race was run with six horses and won by Lady Germaine, owned by J. W. Crutchfield. The appellant Coulter purchased from O. O. Franklin an option on a horse named Penrod Connell, for which option Coulter paid Franklin the sum of five dollars. Franklin was the agent of the Texas Jockey Club. The races were conducted under the auspices of that corporation and also another corporation known as the Texas Thoroughbred Horsemen's Association. From the gate receipts and other sources of revenue, there became available for the purpose of paying the expenses of the corporation conducting the races and providing a purse for the winner in each race, the total sum of between $4,500 and $5,000, from which there was apportioned as a premium for the winner of the "Futurity race" mentioned the sum of $1,925. It appears that there were sold fifty-five options of five dollars each upon the horse known as Lady Germaine, and that Crutchfield (the owner of the horse) authorized the Thoroughbred Horsemen's Association to redeem the fifty-five options which had been issued on Lady Germaine at the price of thirty dollars for each option. Each holder of the options mentioned on Lady Germaine was paid thirty dollars for the surrender of his option.

The Texas Jockey Club, a private corporation, with a capital stock of $10,000, was formed, as stated in the charter, for the following purpose: "The encouragement of agriculture and horticulture by associations for the maintenance of public affairs, and exhibitions of stock and farm products."

The Texas Thoroughbred Horsemen's Association, a private corporation with a capital stock of $200, was organized for the purpose of "acquiring, raising, breeding, fattening or marketing live stock."

Rules were promulgated by the Texas Thoroughbred Horsemen's Association, Incorporated. The options were printed as follows:

"Texas Jockey Club.     Arlington Downs.
$5.00     Five Dollars.     Above sum received under conditions

printed on reverse side hereof. 205. (Number corresponds with number of entry on printed program.)

"9-19-31.    6."

On the reverse side of said exhibit appears the following:

"This receipt entitles the bearer to the option to claim the horse whose number appears upon the reverse side hereof, at the price set forth upon the official program as the entered price of the horse whose number appears upon the reverse side hereof, under and pursuant to the rules of this association, a copy of which rules is posted for public inspection in the office of the Racing Secretary and made a part hereof.

"To exercise this option the claim must be in writing and filed with the Racing Secretary or Clerk of the Course, accompanied by the amount of the claim in cash, or check guaranteed by the Association, and this receipt, and deposited in a locked box provided for that purpose in the office of the Racing Secretary within thirty minutes after official result of the race has been announced.

"Claiming blanks and envelopes may be obtained from the custodian of the claiming box."

The rules of the Texas Jockey Club governing claiming races contain, in substance, the following:  The owner of the horse entered vested the title of the animal in the association until released.  If the horse was claimed at the entered price by any one holding an option to claim the animal, the title was transferred by the association to the claimant.  The claim, however, was controlled by Rule 175, reading as follows:  "Every claim must be in writing and filed with the Secretary or Clerk of the Course, accompanied by the amount of the claim in cash, or check guaranteed by the Association, and the option receipt issued by the Association entitling said claimant to claim the particular horse, within fifteen minutes after the termination of the race, and shall be deposited in a locked box provided for that purpose.  If more than one person shall enter a claim for the same horse the right to so purchase shall be determined by priority or precedence in numbers respectively.  For instance, Number One the prior right, Number Two next, if the holder of Number One should not make a claim and so on throughout the series of numbers, and the person to whom said horse shall be awarded shall become the owner of the horse, whether it be alive or dead, sound or unsound."

Rule 176 is as follows:  "The Secretary shall not open the claiming box nor inform the owner that a claim has been made until thirty minutes after the race is run."

Rule 179 reads as follows: "In the case of a dead heat, no claim shall be opened until the race has been finally decided, either by a run-off or a division. In case of a division each of the dividend horses is the winner for the purpose of these rules."

The oral testimony of O. O. Franklin is in substance as follows: He lived at Vernon, Texas, and was an employee of the Waggoner estate. He was present at Arlington Downs at the time the race in question took place and was agent of the Texas Jockey Club in the matter of the sale of options. These were offered for sale at five dollars each. One option was sold by the witness to P. L. Coulter for the sum of five dollars.

The appellant, Coulter, gave testimony as follows: He was present at Arlington Downs at the time the race in question was run and also before it began. He looked over the horses and picked out what he thought to be the best horse and bought from the Texas Jockey Club an option to buy the horse if he wanted to do so, at the claim price, which was $300. After the race the witness did not buy the horse, although he was able to do so. The question of his buying the horse depended upon whether in the race the animal showed extra value. The horse did not win but lost the race. The witness did not think he was engaged in a gambling transaction.

Joseph Murphy, for the defendant, gave testimony in substance as follows: He was present at the race and came there at the invitation of Mr. Waggoner. The race was known as the "Futurity Race," by which was meant that when a mare was foaled, an agreement was made to race the colt of said mare when it became two years old. The witness had charge of the details of the business conducted that day for the Texas Jockey Club, outside of the matter of selling options, which was under the supervision of another individual. The budget was made by the witness. Eight horses were entered, but only six of them ran. Crutchfield's horse (Lady Germaine), ran first in the race. The purse money consisted of all the receipts of the association, gate receipts, programs, the concessions, and the sale of options, all of which went into one budget, which was the fund that accrued in the hands of the Texas Jockey Club. The receipts on the day of the races amounted to something less than $5,000. The options were sold by the Texas Jockey Club to increase the revenue to be used in paying the expenses and disbursements incident to the races. For all options sold the sum of five dollars cash was received. The sole object of the Texas Jockey Club was to entertain the public. No money

was made or intended to be made by the club. The purchaser of an option on a horse that was raced had fifteen minutes after the race within which to exercise his right to buy the horse. There were fifty-five options sold on Lady Germaine. Mr. Crutchfield redeemed them at thirty dollars each. The purse accorded Mr. Crutchfield, the owner of the winning horse, was $1,925. From the testimony of the witness (Murphy), the following is quoted:

"Each option bears a number. Those options are numbered in the order in which they are sold. In other words, if you are the first man that buys a ticket on Lady Germaine, your ticket, just for illustrative purposes, would be Ticket No. 1, and if Judge Barwise was behind you and came along, his ticket would be No. 2, and so on. There would be a priority of rights by virtue of the ticket number which you hold as against the other ticket for the purchase of the horse.

"If you came up to the window at the same time that Ticket No. 2 came up, and both of you desired the delivery of the horse at the claim price published on the program, the one with the prior ticket would get the horse. I mean Ticket No. 1 would get the horse before No. 2, and so on.

"You asked me what would have been the situation or result, if, under Crutchfield's authority, the Horsemen's Association had purchased 54 of the outstanding 55 options on his horse, and the remaining option had not been purchased, and the holder of the unpurchased one option had, within the fifteen minutes, gone to the Texas Jockey Club, and said, 'I want that horse.' My answer is that even though the 54 options had been purchased, the holder of the outstanding unpurchased one option would have had the right, by complying with the rules, to have become the purchaser of the horse at the price of $300.00.

"In that situation it would have been true that Crutchfield would have paid out $30.00 each for the 54 options, and would have been required to sell and deliver the horse for the $300.00, and it is true that, in that situation, he would have been out the money thus paid out for the 54 options, and would have lost his horse, and would have received only the $300.00, the claiming or purchase price of the horse.

"I state, in connection with this, that the plan effective and controlling in the holding of this race was that one who wished to avail of the option to purchase a horse was required, within fifteen minutes from the finishing of the race, to deposit the purchase price for the horse he desired to claim, together with the option under which he was making the purchase, in a locked

box provided by the Texas Jockey Club for the depositing of the purchase price of horses entered in the claiming race. This locked box was kept locked and closed without knowledge on the part of anybody as to the contents thereof until the expiration of the fifteen minutes from the finish of the race, at which time it was opened by the Texas Jockey Club to ascertain whether any claims had been made for the purchase of any horse in accordance with the agreed plan.

"It is true that the money paid out for the purchase of outstanding options where any owner or owners of horses authorized the purchase of such outstanding options is paid, should be paid out, and, so far as I know, is paid out within the fifteen-minute period after the finishing of the race.

"The fifteen-minute period referred to is computed from the time what is called the "red board" goes up. The "red board," or which is the same thing, the "official board," goes up as soon as the riders of the horses are weighed in after the race to verify the weight. The "red board" is the official indication of the finish of the race, and, from the time it goes up, the fifteen-minute period starts."

From the complaint in the present case the following is quoted: "* * * P. L. Coulter * * * in the County of Tarrant and State aforesaid, did then and there unlawfully buy a pool and did then and there bet and wager five dollars in money on a horse race to be run then and there in said County and State and on what is commonly known as the Arlington Dows Race Track."

Article 648, P. C., 1925, reads as follows: "No person or any agent of any association of persons or corporation, at any place in this State, by pool selling or bookmaking or by means of telegraph, telephone or otherwise, shall aid or assist any other person in wagering, betting or placing a bet or in offering to wager, bet or place a bet of anything of value on any horse race to be run, trotted, or placed at any place in this State or elsewhere."

Article 645 of the Penal Code reads thus: "The bet or wager may be of money, or of any article of value, and any device in the form of purchase or sale or in any other form made for the purpose of concealing the true intention of the parties is equally within the meaning of a bet or wager."

Article 651, P. C., 1925, reads as follows: "Whoever shall buy pools or otherwise wager anything of value on any horse race to be run, trotted or paced, at any place in this State or elsewhere, or offers to wager, or offers to place any money or

other thing of value with any other person to be transmitted to any other place to be wagered on any such horse race, shall be fined not less than twenty-five nor more than one hundred dollars."

Article 652, P. C., reads thus: "A conviction for the violation of any provision of the five preceding articles may be had upon the unsupported evidence of an accomplice or participant. Such accomplice or participant shall be exempt from prosecution for any offense under this law about which he may be required to testify."

In the case of Irwin v. Williar, 110 U. S., 499, cited by the appellant, particularly in the annotations of the case in Rose's Notes on U. S. Reports, vol. 12, p. 389, it is said: "If, under guise of contract of sale, for future delivery, real intent be merely to speculate in fluctuation of prices, and delivery of goods is not intended, but one party is to pay to other difference between contract and market prices at date fixed for executing contract, transaction is a wager, and void."

From the case of Rich v. State, 38 Texas Crim. Rep., 199, 42 S. W., 291, 292, 38 A. L. R., 719, cited by the appellant, the following is taken: "A bet or wager is ordinarily an agreement between two or more that a sum of money, or some valuable thing, in contributing which all agree to take part, shall become the property of one or more of them on the happening in the future of an event at the present uncertain, or upon the ascertainment of a fact in dispute. * * * The usual signification of "to bet" is to put to hazard a sum ascertained upon a future happening of some event then uncertain. * * * A bet is a wager, and the betting is complete when the offer to bet is accepted."

In the case of Seay & Company v. Moore (Tex. Com. App.), 261 S. W., 1013, 1014, also cited by the appellant, it was said: "A wager is a contract by which two or more parties agree that a certain sum of money or other thing of value shall be paid or delivered to one of them upon the happening of an uncertain event; it implies that each of the parties shall jeopardize something and have a chance to gain something or to recover the stakes or thing bet or wagered upon the determining of the contingent or uncertain event in his favor, and hence is a form of gambling."

To determine whether there was evidence to sustain the conviction of the appellant Coulter, it was competent for the trial court, in the absence of a jury, to ascertain the mutual intent with which the parties to the transaction acted. In the character of case under consideration, the mutual dealings of

the parties, as shown by the evidence, are available to determine the nature of the contract. Such is the rule announced in the Penal Code, art. 645, quoted above.

While the procedure outlined and followed is to a degree novel, there has come to our attention some precedents indicative of the judicial view of similar transactions. Among them is the case of State of Ohio v. Falls City Amusement Co., 124 Ohio St., 518, 79 Amer. Law Rep., 568, sustaining the exclusion from the State of Ohio of a corporation known as the "Three A. Systems, Adams Animal Auction for Horses or Dogs." The scheme is set out in full in the opinion. Quotation of it in full is impracticable. The contract, however, is embraced in the following language, as well as the comment of the court in sustaining the ouster.

"For the sum indicated on the face hereof, the undersigned hereby sells and transfers to the holder hereof a like interest in the dog whose name appears on a program issued by the undersigned, (of even date) opposite a number corresponding to the number hereon. The interest herein sold to be held subject to a first and second mortgage duly recorded. This contract is made and the holder of this bill of sale accepts the same subject to the following condition: such holder within four hours from the acceptance of this contract shall either purchase the entire interest in said dog or surrender this bill of sale at the appraised value thereof as disclosed by an appraisal made by three competent appraisers."

"Manifestly the scheme was devised and the pamphlet printed for the self-serving purpose of affording its author or operator a defense in a court of justice where the legality of the operation of the scheme is being questioned. It not only falls short of accomplishing such purpose in this cause, but, like the monster of Frankenstein's creation, it affords the very evidence which requires a judgment of ouster."

While not upon identical facts, the principles controlling the decision in the case of Pompano Horse Club et al. v. State of Florida, 93 Fla., 415, 111 So., 801, 812, 52 A. L. R., 51, are deemed analogous to those pertinent in the present appeal. From the opinion we quote as follows: "The question before us is whether or not the buying, selling and redeeming of certificates, in the manner and for the purpose stated, constitutes gambling, or a game of chance. Regardless of whether horse racing, within itself, is a 'game' or a 'sport,' or if a game, whether it be one of 'skill' or of 'chance'—when a group of persons, each of whom has contributed money to a common

fund and received a ticket or certificate representing such contribution, adopt a horse race, the result of which is uncertain, as a means of determining, by chance, which members of the group have won and which have lost upon a redivision of that fund, each contributor having selected a stated horse to win such race, the redeemable value of the certificates so obtained and held by the contributors to such fund being varied or affected by the result of such race, so that the value of some is enhanced, while that of others is reduced or destroyed, the original purchase price of all having been the same, those who chose the winning horses being paid from the fund so accumulated more than they contributed thereto, by dividing amongst them the money contributed by those who chose losing horses and who therefore receive nothing, that process becomes a 'game of chance.' "

The conclusion of guilt found by the trial judge implies that the evidence was regarded by him as showing that the mutual understanding of the parties to the transaction was that, dependent upon the result of the horse race, the money invested in the options would be lost or increased. The procedure outlined in the making of the contract and pursued throughout the transaction is not without strength in supporting the finding of fact by the trial judge.

The judgment is affirmed.

*Affirmed.*