**Jeff J. BARNES, Appellant,**

v.

**Wendell BAILEY, et al., Respondents.**

**No. 67631.**

Supreme Court of Missouri,
En Banc.

Feb. 19, 1986.

Rehearing Denied March 25, 1986.

---

Duane Benton, Harvey M. Tettlebaum, W.B. Tichenor, Jefferson City, for appellant.

William L. Webster, Atty. Gen., Phillip K. Gebhardt, Asst. Atty. Gen., Jefferson City, for respondents.

PER CURIAM.

This case involves an ongoing challenge to pari-mutuel wagering. When the pari-mutuel wagering petitions were submitted to the Secretary of State, he refused to place the proposal on the November 6, 1984 ballot. A mandamus action was brought, which resulted in an order requiring that the measure be placed on the ballot. *Payne v. Kirkpatrick*, 685 S.W.2d 891 (Mo. App.1984). The voters adopted the amendment while the case was pending appeal. The Secretary of State moved to dismiss the appeal as moot, alleging that the pari-mutuel amendment is void because it is inconsistent with the lottery amendment which was adopted at the same election and which received a greater number of votes. This motion was overruled.

On June 12, 1985, the legislature passed Conference Committee Substitute for House Bill No. 4, which, among other expenditures, appropriated $231,900 to the Missouri Department of Revenue from the General Revenue Fund for the purpose of funding the Missouri Horse Racing Commission. Section 4.140. The same act also appropriated funds for bingo and the state lottery.

Philip F. Cardarella and appellant Jeff J. Barnes, as taxpayers, brought this suit to challenge the appropriation of funds for pari-mutuel wagering. Appellant Barnes further claims that he has standing because he opposes legalized gambling, bingo and pari-mutuel wagering, upon religious grounds, asserting that he is the Chairman of the Christian Life Committee of the Missouri Baptist Convention. The trial court

consolidated the two cases. Together, the petitions for declaratory judgment contain six counts: (1) that the Horse Racing Commission cannot be under the Missouri Department of Revenue, (2) that the pari-mutuel wagering amendment is inconsistent with the lottery amendment and therefore void, (3) that the voters cannot adopt a pari-mutuel wagering amendment by way of initiative, (4) that the pari-mutuel wagering amendment is void because it contains more than one article and more than one subject, (5) that the bingo amendment has been repealed, and (6) that the executive order for pari-mutuel wagering is invalid. The trial court, finding that the parties had standing,[1] issued findings of fact and conclusions of law, ruling all counts against appellants. Barnes has appealed. The issues on appeal involve the validity of a constitutional provision and this Court has original appellate jurisdiction. Mo. Const. art. V, § 3. We affirm the judgment of the trial court.

## I

On November 6, 1984, the people of the State of Missouri adopted two proposed constitutional amendments, one authorizing a state lottery and the other authorizing pari-mutuel wagering.[2] The lottery amendment received 1,369,910 affirmative votes, and the pari-mutuel amendment received 1,157,664 affirmative votes. Appellant asks this Court to invalidate the initiative-originated pari-mutuel wagering amendment based upon an alleged irreconcilable conflict between that amendment and the legislatively-originated lottery amendment. Appellant posits that an irreconcilable con-

flict exists because the lottery amendment prohibits pari-mutuel wagering, while the pari-mutuel amendment prohibits a state lottery and bingo. Under Missouri Constitution Article III, § 51, if conflicting measures are approved at the same election, the measure receiving the higher number of votes shall prevail. Section 51 incorporated into our Constitution an existing statutory provision, § 12292, RSMo 1939 (now § 116.310.3, RSMo.Cum.Supp.1984). Debates of the 1943–44 Constitutional Convention in Missouri 443–44. Appellant would have us strike the pari-mutuel amendment because it received the smaller number of affirmative votes.

When the lottery amendment and the pari-mutuel wagering amendment are cut and pasted into the Constitution, the result is two identical substantive provisions having different designations (§ 39 and § 39(a)), two different provisions designated as § 39(a) and two different provisions designated as § 39(b). Missouri Constitution article III, § 39(9) of the lottery amendment provides:

[The general assembly shall not have power:]

**Except as otherwise provided in section 39(b) of this article,** to authorize lotteries or gift enterprises for any purpose, and shall enact laws to prohibit the sale of lottery or gift enterprise tickets, or tickets in any scheme in the nature of a lottery; except that, nothing in this section shall be so construed as to prevent or prohibit citizens of this state from participating in games or contests of skill or chance where no consideration is required to be given for the privilege or

---

1. It might be noted the trial court found that appellant did not have standing to challenge the effect of the pari-mutuel amendment upon the bingo amendment, but it nevertheless decided the issue.

2. CONSTITUTIONAL AMENDMENT NO. 5

State lottery authorized. Permits legislature to set certain standards. Provides for division of funds received. There would be no cost to the state or local governments as all expenses would be paid from revenue derived from lottery proceeds.

CONSTITUTIONAL AMENDMENT NO. 7

Authorizes pari-mutuel wagering on horse racing; creates Missouri Horse Racing Commission; creates special fund allocated to Commission, certain educational programs, horse research, and prizes; allows voters of each county to prohibit pari-mutuel wagering locally. Commission's costs, $200,000 to $500,000, will be borne by state until proceeds from wagering are realized. Estimates of state proceeds range from $12 million to $30 million per year depending on rules and laws passed.

opportunity of participating or for receiving the award or prize and the term "lottery or gift enterprise" shall mean only those games or contests whereby money or something of value is exchanged directly for the ticket or chance to participate in the game or contest. The general assembly may, by law, provide standards and conditions to regulate or guarantee the awarding of prizes provided for in such games or contests under the provision of this subdivision.

(Emphasis illustrates the only change in the previous § 39(9)). This identical language can be found in Mo. Const. art. III, § 39(a)(9) of the pari-mutuel amendment. The sole object of the lottery amendment is to authorize a state lottery, and the sole object of the pari-mutuel wagering amendment is to authorize pari-mutuel wagering. Section 39(b) of the lottery amendment authorizes the creation of a Missouri state lottery, and § 39(b) of the pari-mutuel amendment provides that "such pari-mutuel wagering shall be lawful notwithstanding the provisions of section 39(a)(9) of this article or any other provisions of the constitution or of law and such pari-mutuel wagering shall not be considered to be 'gambling' as that term is used in any law or regulation." Mo. Const. art. III, § 39(b)(ii)(2) (1984). Along with § 39(a) of the pari-mutuel wagering amendment, there is another constitutional provision § 39(a) adopted in 1980 authorizing bingo. Unfortunately, ours is not the power to sit in judgment on the appearance of our Constitution or to re-number and re-arrange these provisions in a consistent fashion. The legislature already has embarked on the appropriate process to effect the re-numbering and re-arrangement of these amendments. Rather, our function is to give effect, if at all possible, to the will of the people in passing the amendments.

■ The fundamental rule of constitutional construction is that courts must give effect to the intent of the people in adopting the amendment and resolve seemingly conflicting provisions by harmonizing those provisions. Substance and not form should govern, and courts will not invalidate an amendment upon a mere technicality. *See generally* 16 Am.Jur.2d Constitutional Law §§ 53, 57 (1979). If after giving effect to the intent of the people it becomes evident that the provisions cannot be harmonized, only then can this Court employ Mo. Const. art. III, § 51 to determine which amendment prevails. In *State ex Inf. Ashcroft v. City of Fulton*, 642 S.W.2d 617, 620 (Mo. banc 1982), this Court held that the "test for determining whether a conflict exists is whether one amendment prohibits what the other permits or vice versa." Our function is to interpret each amendment and determine what each permits and what each prohibits; and we must perform our role of interpreting constitutional amendments in accordance with accepted canons of interpretation. In *State v. Toberman*, 363 Mo. 245, 250 S.W.2d 701 (Mo. banc 1952), this Court stated:

> In constitutional construction, the instrument must be read as a whole, insofar as other parts may throw light on other parts thereof. Courts should resolve seemingly conflicting provisions by harmonizing and rendering every word operative, if possible, so as to give effect to the whole. A construction which renders meaningless any of its provisions should not be adopted by the court. " 'If a literal interpretation of the language used in a constitutional provision would give it an effect in contravention of the *real purpose and intent* of the instrument as deduced from a consideration of all its parts, such intent must prevail over the literal meaning. * * * ' Where the *spirit and intent of the instrument can be clearly ascertained,* effect should be given to it, and the strict letter should not control if the letter leads to incongruous results clearly not intended." It should never be construed to work confusion and mischief, unless no other reasonable construction is possible.

*State v. Toberman, supra,* at 705 (citations omitted) (emphasis added). *See also State ex rel. Crutcher v. Koeln*, 332 Mo. 1229, 61 S.W.2d 750 (banc 1933); *State ex rel. City of Carthage v. Hackmann*, 287 Mo. 184,

229 S.W. 1078 (1921). This Court recently recognized that "[d]ue regard [must be] given to the primary objectives of the provision in issue as viewed in harmony with all related provisions, considered as a whole. By following these rules, the fundamental purpose of constitutional construction is accomplished, to give effect to the intent of the voters who adopted the amendment." *Boone County Court v. State*, 631 S.W.2d 321, 324 (Mo. banc 1982). *See also State at Inf. Martin v. City of Independence*, 518 S.W.2d 63, 66 (Mo. 1974); *State v. Atterbury*, 300 S.W.2d 806, 810 (Mo. banc 1957).

■ Before interpreting the two amendments in question, it must be noted that neither of the amendments should fail merely because they both called for the repeal of the same constitutional provision. *See State ex Inf. Ashcroft v. City of Fulton, supra; Gabbert v. Chicago R.I. & P. Ry. Co.*, 171 Mo. 84, 70 S.W. 891 (1902). Each of the amendments repealed the old Mo. Const. art. III, § 39 and reinstated the substance of that provision in the newly designated sections 39 and 39(a), with the single change that the phrase "except as otherwise provided in section 39(b) of this article" was added to subsection (9).

■ Appellant avers that the lottery amendment prohibits pari-mutuel wagering and therefore is in irreconcilable conflict with the pari-mutuel amendment. Such an argument ignores that this Court must interpret the amendments to give effect to the intent of the people and harmonzie provisions where possible. Section 39(9) of the lottery amendment prohibits "lotteries or gift enterprises" except those in § 39(b). Two reasons illustrate why this language in the lottery amendment does not prohibit pari-mutuel wagering. First, it is clear that the people of Missouri by their votes intended that a state lottery and pari-mutuel wagering not fall within the general prohibition against "lotteries or gift enterprises." The clause in both the lottery amendment and the pari-mutuel wagering amendment permitting activities in § 39(b), coupled with the voters' approval of both amendments containing a § 39(b), indicates that the people intended that each § 39(b) be read as an exception to "lotteries or gift enterprises" whether in the general prohibition of the lottery amendment or the pari-mutuel wagering amendment. Each voter thought and believed that if he or she voted for both amendments then each of the amendments would be added to the Constitution in its proper place. Second, even if this Court were to disregard the intent of the people, as appellant would have us do, the lottery amendment by its plain terms does not prohibit pari-mutuel wagering. The lottery amendment excepts from its general prohibition activities contained in § 39(b). The voters adopted two sections designated as 39(b), and by the plain terms of the lottery amendment each of these sections falls within the exception to the general prohibition in § 39(9). Neither the plain language of the lottery amendment nor what we perceive to be the intent of the people prohibits pari-mutuel wagering.

■ Appellant also asserts that the pari-mutuel amendment prohibits both a state lottery and bingo and thus presents an irreconcilable conflict between the amendments. The argument that the pari-mutuel amendment prohibits a state lottery fails for the reasons just stated, and we do not agree with appellant's assertion that the pari-mutuel amendment prohibits a state lottery fails for the reasons just stated, and we do not agree with appellant's assertion that the pari-mutuel amendment prohibits bingo. It is true that the pari-mutuel amendment creates a new section designated as § 39(a), while the already existing bingo provision is also designated as § 39(a). However, nothing in the notice to the voters in the pari-mutuel wagering amendment purported to repeal the 1980 constitutional amendment authorizing bingo, which provides that certain bingo activities shall not be deemed "a lottery or gift enterprise within the meaning of subdivision (9) of section 39 of this article ..." Mo. Const. art. III, § 39(a) (1980). Although constitutional provisions may be repealed by implication, such repeals are not

favored and there must be an irreconcilable repugnance between the two provisions. *Moore v. Brown*, 350 Mo. 256, 165 S.W.2d 657, 663 (banc 1942). In the case at bar, there can be no irreconcilable repugnance between the two provisions designated as § 39(a) because the substance of each amendment is completely different. One amendment permits pari-mutuel wagering while the other permits certain bingo activities.

Appellant further contends that even if the bingo amendment is not repealed, bingo still falls within the prohibition against "lotteries or gift enterprises" contained in § 39(a)(9) of the pari-mutuel amendment. This argument fails to consider the intent of the people. The bingo amendment expressly provides that the activities contained therein shall not be deemed a lottery or gift enterprise under § 39(9). Section 39(a)(9) is identical to § 39(9), and this Court must look to the language used and not the numerical designation of the sections. We interpret the bingo amendment to provide an exception to "lotteries or gift enterprises" in both places where that phrase appears.

## II

We now turn our attention to other challenges raised by appellant. This Court agrees with the court of appeals opinion in *Payne v. Kirkpatrick, supra,* as it relates to appellant's arguments under Counts 3 and 4.

## III

■ Counts 1 and 6 are directed at the constitutionality of including the Missouri Horse Racing Commission under the Missouri Department of Revenue. Such an assignment by the Executive was within the executive powers. Mo. Const. art. IV, § 12. *See also* § 1.13 of Omnibus State Reorganization Act of 1974, Appendix B, RSMo Cum.Supp.1984.

## IV

■ Underlying appellant's entire argument in this case is the assumption that all gambling, including horse racing, is prohibited by our Constitution under Art. III, § 39(9).[3] This Court has never before addressed this question. We believe it is appropriate to comment upon this unresolved constitutional question, because this case involves the question of whether the legislature is prohibited under our Constitution from appropriating funds for pari-mutuel wagering.

During the late eighteenth and early nineteenth centuries, lotteries were commonplace. "Lotteries, from which the state treasury often took a cut, were commonly authorized by state legislatures to support 'private' institutions. Benjamin Franklin," for example, "once printed eight thousand tickets for a lottery authorized by New Jersey to benefit Princeton." D. Boorstin, The Americans: The National Experience 161 (1965). Governments often relied upon lotteries "to raise money for new courthouses, internal improvements, and the like." L. Friedman, A History of American Law 586 (2nd Ed.1985). *See also* M. Keller, Affairs of State 509 (1977). It might be noted that an important United States Supreme Court case involved a congressional authorization for a lottery to raise revenue for Washington, D.C. *Cohens v. Virginia,* 19 U.S. (6 Wheat.) 264, 5 L.Ed. 257 (1821).

Widespread evangelicism, however, led states to embark upon what became a national outcry against lotteries. Lotteries and gift enterprises became regarded as a *particular form* of gambling that merited special prohibition. By the turn of the century, almost all of the states and Congress had anti-lottery laws. L. Friedman, *supra,* at 586; M. Keller, *supra,* at 509–10, 233. Many states, such as Alabama, Arkansas, Georgia, Louisiana, Michigan, Mississippi and Missouri, included the prohibi-

---

**3.** Appellant's only authority is an attorney general opinion. Op.Atty.Gen. No. 77, Gann, 7/12/82.

tion directly in their state constitution. When discussing the constitutionality of such anti-lottery laws, the United States Supreme Court observed:

> If lotteries are to be tolerated at all, it is no doubt better that they should be regulated by law, so that the people may be protected as far as possible against the inherent vices of the system; but that they are demoralizing in their effects, no matter how carefully regulated, cannot admit of a doubt. When the government is untrammelled by any claim of vested rights or chartered privileges, no one has ever supposed that lotteries could not lawfully be suppressed, and those who manage them punished severely as violators of the rules of social morality. From 1822 to 1867, without any constitutional requirements, they were prohibited by law in Mississippi, and those who conducted them as a kind of gamblers. During the provisional government of that State, in 1867, at the close of the late civil war, the present act of incorporation, with more of like character was passed. The next year, 1868, the people, in adopting a new constitution with a view to the resumption of their political rights as one of the United States, provided that "the legislature shall never authorize any lottery, nor shall the sale of lottery-tickets be allowed, nor shall any lottery heretofore authorized be permitted to be drawn, or tickets therein to be sold.: Art. 12, sect. 15. There is now scarcely a State in the Union where lotteries are tolerated ...

*Stone v. Mississippi,* 101 U.S. 814, 818–19, 25 L.Ed. 1079 (1879). In *Stone,* and earlier in *Boyd v. Alabama,* 94 U.S. 645, 24 L.Ed. 302 (1876), the Supreme Court upheld anti-lottery laws against constitutional challenges. *See also Douglas v. Kentucky,* 168 U.S. 488, 18 S.Ct. 199, 42 L.Ed. 553 (1897); *New Orleans v. Houston,* 119 U.S. 265, 7 S.Ct. 198, 30 L.Ed. 411 (1886). And in 1903, the Supreme Court upheld a federal law prohibiting the interstate transport of lottery tickets, often referring to the *evil* of lotteries as "a species of interstate commerce which, although in general use

and somewhat favored in both national and state legislation in the early history of the country, has grown into disrepute and has become offensive to the entire people of the Nation." *Champion v. Ames,* 188 U.S. 321, 358, 23 S.Ct. 321, 328, 47 L.Ed. 492 (1903). *See also In Rapier,* 143 U.S. 110, 12 S.Ct. 374, 36 L.Ed. 93 (1892) (lottery matter excluded from the mails). However, other forms of gambling, such as horse-racing, did not capture the public's attention. The Supreme Court offered the explanation that:

> [e]xperience has shown that the common forms of gambling are comparatively innocuous when placed in contrast with the widespread pestilence of lotteries. The former are confined to a few persons and places, but the latter infects the whole community: it enters every dwelling; it reaches every class; it preys upon the hard earnings of the poor; it plunders the ignorant and simple.

*Phalen v. Virginia,* 49 U.S. (8 How.) 163, 168, 12 L.Ed. 1030 (1850). Gambling, therefore, continued in many jurisdictions but subject to legislative regulation.

Jurisdictions that have been presented with the problem of defining a lottery or gift enterprise have held that horse racing does not fall within such a constitutional ban. The Supreme Court of Louisiana quoted a previous Louisiana case to hold that "[t]he business of [recovering a bet on the result of a horse race] has never been considered a lottery ..." *Gandolfo v. Louisiana State Racing Comm'n,* 227 La. 45, 78 S.W.2d 504, 509 (1954). The court added that "[a] vast majority of common law jurisdictions have reached a similar result." *Gandolfo v. Louisiana State Racing Comm'n, supra.* When deciding whether a bill authorizing pari-mutuel wagering contravened the restriction that the "[t]he legislature shall have no power to authorize lotteries or gift enterprises for any purposes," the Alabama Supreme Court held:

> There is no question but [t]hat pari-mutuel wagering is gambling, but the Constitution does not restrict the legislature in

its authority to authorize gambling. It merely says that the legislature shall not authorize a lottery.

*Opinion of the Justices,* 287 Ala. 334, 251 So.2d 751, 753 (1971). After illustrating why pari-mutuel wagering is not a lottery, the court observed that "it is interesting to note that a substantial majority of other courts have held that pari-mutuel betting on horse or dog races does not contravene constitutional prohibitions against lotteries." *Opinion of the Justices, supra,* at 754. The same conclusion has been reached by other courts. *See Scott v. Dunaway,* 228 Ark. 943, 311 S.W.2d 305 (1958); *Ginsberg v. Centennial Turf Club,* 126 Colo. 471, 251 P.2d 926 (1952); *Oneida County Fair Board v. Smylie,* 86 Idaho 341, 386 P.2d 374 (1963); *Rohan v. Detroit Racing Ass'n,* 314 Mich. 326, 22 N.W.2d 433 (1946); *Utah State Fair Ass'n v. Green,* 68 Utah 251, 249 P. 1016 (1926). And when opponents to Churchill Downs alleged that the event contravened the constitutional ban on lotteries, the Kentucky Supreme Court offered an exhaustive analysis. The court concluded that the view that horse racing might even fall within such a constitutional ban is of recent origin and without any support. *Commonwealth v. Kentucky Jockey Club,* 238 Ky. 739, 38 S.W.2d 987, 992–94 (1931).

The history of Missouri clearly indicates that, as in the other jurisdictions, the prohibition against lotteries and gift enterprises never included within its terms horse racing. In *State ex Inf. McKittrick v. Globe-Democrat Pub. Co.,* 341 Mo. 862, 110 S.W.2d 705 (banc 1937), this Court observed that the Constitutional prohibition was directed particularly to "lotteries" and gift enterprises in the ordinary sense of those terms and not to other forms of gambling:

The word has no technical meaning in our law. Lotteries are judicially denounced as especially vicious, in comparison with other forms of gambling, because by their very nature they are public and pestilentially infect the whole community. They prey upon the credulity of the unwary and widely arouse and appeal to the gambling instinct.

*State ex Inf. McKittrick v. Globe-Democrat Pub. Co., supra,* at 713. *See also Mobile Oil Co. v. Danforth,* 455 S.W.2d 505, 508 (Mo.1970) (quoting from Williams, *Lotteries, Laws and Morals* on the particular evil of lotteries). Well after lotteries and gift enterprises became illegal, horse racing and betting thereon was legal if conducted in accordance with various state regulations. *See generally Aquamsi Land Co. v. City of Cape Girardeau,* 346 Mo. 524, 142 S.W.2d 332, 336 (1940); *State v. Delmar Jockey Club,* 200 Mo. 34, 92 S.W. 185 (1905); *State v. Thompson,* 160 Mo. 333, 60 S.W. 1077 (1901); *State v. Thomas,* 138 Mo. 95, 39 S.W. 481 (1897). For example, horse racing and betting was permitted if conducted within this state by a licensed operator. §§ 2191, 7419–22, RSMo 1899.

During the debates at the 1943–1944 State Constitutional Convention, the delegates were in agreement that the prohibition against lotteries and gift enterprises did not include other forms of gambling, such as horse racing. The question arose whether the amendment should be stricken out of the Constitution. Mr. Hullverson argued that the subject matter was more properly left to the legislature than to a constitutional amendment. He querried those seeking to retain the amendment why they did not also want to include all gambling devices, such as horse racing, in the Constitution. Mr. Hanks replied that a line had to be drawn and a lottery was particularly destructive. He added:

The difference is this, Mr. Hullverson, if you will listen carefully, I think I'll tell you. In the hands of local law enforcement authorities is the power, under the criminal code, to suppress the things you speak of, but when you strike this Section from the Constitution as you propose to do, it invites your General Assembly to search for a method of raising high sums and to do it by lottery instead of by the sources of revenue of taxation purposes. Now, that's the difference. On the one hand you have a purely local

criminal code. Upon the other hand you have public policy, and it is with respect to that this particular Section ought to be retained.

Later in the discussion, Mr. Allen stated:

I am not in favor of the lotteries. Neither am I in favor of the state going into the horse-racing business like Florida has, but there is no provision in this Constitution, or has one been offered, to keep us out of the horse-racing business.

Debates of the Missouri Constitution 1945, at 1132–43. This analysis of our constitutional limitation against lotteries or gift enterprises points out the error in appellant's assumption, and it further illustrates the legislative *power* to authorize the expenditure of the funds.

Normally, we seek to resolve all of our cases on the narrowest ground possible. While we have no doubt that the power of the legislature to appropriate funds for pari-mutuel wagering is fully sustainable on this ground alone, the fact that the people have favorably expressed their opinion on Amendment No. 7 makes our examination of the effect of that amendment on our Constitution totally appropriate in this instance. Whether Amendment No. 7 was necessary or not, the attention focused on this matter by the citizens of Missouri will, we hope, have the salutary effect of making Missouri one of the best regulated states in the nation as far as pari-mutuel wagering is concerned.

The judgment of the trial court is affirmed.

HIGGINS, C.J., BILLINGS, DONNELLY and WELLIVER, JJ., and DOWD, Special Judge, concur.

ROBERTSON, J., dissents in separate dissenting opinion filed.

RENDLEN, J., dissents and concurs in separate dissenting opinion of ROBERTSON, J.

BLACKMAR, J., not sitting.

ROBERTSON, Judge, dissenting.

I respectfully dissent.

Mo. Const. art. III, § 51 provides: "When conflicting measures are approved at the same election the one having the largest affirmative vote shall prevail." *See also* § 116.320.3 RSMo Cum.Supp.1984. With great foresight, our Constitution predicted a scenario similar to the one now before the Court in which conflicting amendments to the constitution each achieved a majority vote at the same election. When such an event took place, the people intended that only the amendment receiving the greatest number of affirmative votes prevail, despite the fact that both received a popular majority. The rule is firm and controls unless it can be shown that no conflict between the two amendments exists.

In *State ex inf. Ashcroft v. City of Fulton*, 642 S.W.2d 617, 620 (Mo. banc 1982) this Court said: "The test for determining whether a conflict exists is whether one amendment prohibits what the other permits or vice versa."

Both Constitutional Amendment No. 5 (the lottery) and Constitutional Amendment No. 7 (pari-mutuel wagering) repeal Mo. Const. art. III, § 39. Each amendment proposes identical new language for the former Section 39(9) as follows: "Except as otherwise provided in section 39(b) of this article...." Each amendment proposes an exception, designated 39(b), to the general constitutional prohibition against the General Assembly adopting legislation establishing lotteries or gift enterprises, Mo. Const. art. III, § 39(9). Each amendment permits *only* the exception to § 39(9) which *it* proposes. If the general prohibition from which the exceptions are carved otherwise prohibits what is permitted by the exceptions then a conflict exists between the two amendments. If such a conflict exists, then the pari-mutuel amendment must fail under § 51.

Clearly, the only real question in this case is whether the general prohibition of § 39(9) prohibits pari-mutuel wagering. The per curiam denies that pari-mutuel wagering falls within the proscription against

lotteries and gift enterprises found in that constitutional provision. I disagree.

The elements of a lottery are prize, consideration and chance. *State ex inf. McKittrick v. Globe-Democrat Publishing Co.*, 341 Mo. 862, 110 S.W.2d 705, 713 (banc 1937). Missouri rejects the pure chance doctrine and finds a lottery whenever prize, consideration and chance as a dominant factor are present in an undertaking. Thus, a lottery "includes *every* scheme or device whereby anything of value is for a consideration alloted by chance." *Id.* (Emphasis added).[1]

*McKittrick*'s definition of lottery is consistent with the plain, ordinary and natural meaning of the word as commonly understood by the people. We are instructed, in *Buechner v. Bond*, 650 S.W.2d 611, 613 (Mo banc 1983), that such meaning is found in the dictionary. Webster's Third New International Dictionary (1966) defines "lottery" as "a scheme for the distribution of prizes by lot or chance." *Id.* at 1338. By contrast, the per curiam adopts a technical definition of "lottery" which is inconsistent with both *McKittrick* and the commonly understood meaning of the word.

Pari-mutuel wagering is "a form of wagering on the outcome of horse races in which those who wager purchase tickets of various denominations on a horse or horses in one or more race or races, all wagers are pooled, and when the outcome of the race or races is declared official, the total wagers comprising each pool [less required adjustments] ... will be distributed to holders of winning tickets on the winning horse or horses." Constitutional Amendment No. 7, § 39(b)(1)(i). The elements of a lottery—prize, consideration and chance—are undeniably present in pari-mutuel wagering.

Regardless of whether horse racing, within itself, is a "game" or a "sport", or if a game, whether it is one of "skill" or of "chance"—when a group of persons, each of whom has contributed to a common fund and received a ticket or certificate representing such contribution, adopt a horse race, the result of which is uncertain, as a means of determining, by chance, which members of the group have won and which have lost upon a redivision of that fund, each contributor having selected a stated horse to win such race, the redeemable value of certificates so obtained and held by the contributors to such a fund being varied or affected by the result of such race, so that the value of some is enhanced, while that of others is reduced or destroyed, the original purchase price of all having been the same, those who chose the winning horses being paid from the fund so accumulated more than they contributed thereto, by dividing amongst them the money contributed by those who chose losing horses and who therefore receive nothing, that process becomes a "game of chance."

*Coulter v. State*, 122 Tex.Cr.R. 9, 53 S.W.2d 477, 480–1 (1932). *See also State ex rel. Sorensen v. Ak-Sar-Ben Exposition Co.*, 118 Neb. 851, 226 N.W. 705, 708 (1929) ("The pari-mutuel system of betting and gambling on horse races ... contains every element of a criminal lottery—consideration, chance, price [sic], means of distribution.... [P]ari-mutuel betting ... is an unlawful lottery.") That a conflict exists between the two amendments is beyond cavil.

The per curiam opinion of the Court attempts to dissolve the conflict in two ways: First, the per curiam places great reliance on the intent of the people. Such reliance is understandable, since inquiry into the people's intent would ordinarily be controlling. However, the analysis employed by the per curiam ingores the impact of § 51. In my view, that section cannot be cast aside so lightly. By § 51, we are required to do more than find the intent of the people; we are required to determine, as a threshold matter if the constitutional amendments they approve pass the consti-

---

[1] The 1978 amendments to the constitution changed the holding in *McKittrick* only insofar as consideration now means the exchange of money or something of value. Mo. Const. art. III, § 39(9).

tutional test which the people intended to apply. Because a conflict exists between the two amendments, § 51 preempts our further inquiry into the state of mind of the electorate.

Second, the principal opinion argues that because both the lottery and pari-mutuel amendments designated their exception to § 39(9) as § 39(b), the lottery amendment permits pari-mutuel wagering. This is so, the per curiam argues, because "the lottery amendment excepts from its general prohibition activities contained in § 39(b)." (Principal op. at 8).

Such a conclusion serves only to underscore the conflict between the two amendments. The lottery amendment approves only *its* 39(b); it does not include all other constitutional provisions of the same numerical designation. The mere coincidence of numbering between the two proposed amendments can neither remove the conflict between the amendments nor abrogate the provisions of § 51. It is the text of the amendments which control, not the numbers by which they are designated.

That the text and not a numerical designation is the final arbiter of conflict is highlighted by the principal opinion's treatment of the bingo issue raised by appellant. There the per curiam chooses to ignore (properly, I believe) the designating number assigned by the drafter of the pari-mutuel amendment and rely on the text. The result is to allow the former § 39(a), which permits bingo, to survive *despite* the existence of another § 39(a) in the pari-mutuel amendment. Such an analysis is contrary to the per curiam's inclusion of the pari-mutuel § 39(b) within the lottery amendment *because* of its numerical designation. The per curiam cannot have it both ways.

The logic of the per curiam requires the conclusion that the time-honored constitutional prohibition against lotteries and gift enterprises does not extend to pari-mutuel wagering. However, placing a narrow, limited meaning on the word "lottery", the per curiam does far more than permit the pari-mutuel amendment to stand. It places in the hands of the General Assembly the power to adopt legislation authorizing all forms of gambling which are not lotteries within the narrow meaning adopted by the per curiam.

The per curiam ranges far beyond the ground necessary to decide this case, without just cause for doing so. I cannot countenance such a broad-ranging precedent which is so contrary to our Constitution and to the intent of our people.

I, therefore, respectfully dissent.