Dear Mr. McNeill:
This opinion is in response to your question asking:
 May the Missouri State Lottery Commission enter into a written agreement with other states and/or the District of Columbia for the participation and operation of a joint on-line game?
We have been provided the following additional facts regarding the proposed joint on-line game. Tickets will be sold in Missouri by the lottery game retailers. The proceeds from the sale of tickets for the joint on-line game will be handled in the same fashion as proceeds from other games are now handled; however, a percentage of the proceeds which are allocated to prizes will be pooled with similar funds from other states so as to create a larger jackpot. The percentage of proceeds from the sale of tickets in Missouri allocated to prizes will be within the limit imposed by the Missouri Constitution and statutes. Each state participating in the joint on-line game will conduct its own advertising so there can be compliance in Missouri with the restrictions in the Missouri Constitution and statutes regarding advertising. In effect, the joint on-line game being considered provides for pooling of prize money among states so as to be able to offer a larger jackpot; however, most aspects of the game are administered by each state which participates in the multi-state pool of prize money.
Neither the Missouri Constitution nor applicable state statutes directly address whether the State of Missouri may conduct a joint on-line game. Article III, Section 39(b) of the Missouri Constitution states that "[t]he general assembly shall have authority to authorize a Missouri state lottery." Nothing in Article III, Section 39(b) further defines or limits the types of lottery games the legislature is empowered to authorize. In implementing this constitutional amendment, the legislature created the "State Lottery Commission" with the mandate to "control and manage the state lottery." Section313.210, RSMo 1986. The legislature also provided that:
 The commission shall promulgate such rules and regulations governing the establishment and operation of a state lottery as it deems necessary and desirable to fully implement the mandate of the people expressed in the approval of the lottery amendment to article III of the Missouri Constitution at the general election in November, 1984.
Section 313.220, RSMo 1986. There is no applicable constitutional or statutory provision which expressly prohibits the State Lottery Commission from implementing the proposed joint on-line game.
The next issue is whether the terms "Missouri state lottery" and "state lottery," as used in the applicable constitutional and statutory provisions, prohibit any participation by Missouri in lottery games in cooperation with other states. Specifically, the question is whether the terms "Missouri state" and "state," as used to modify the term "lottery," are intended to exclude this state's participation in a joint on-line game such as described previously.
Certain general principles of constitutional and statutory construction are pertinent. Generally, the rules applicable to constitutional construction are the same as those applied to statutory construction, except that the former are given a broader construction, due to their more permanent character.Boone County Court v. State, 631 S.W.2d 321, 324 (Mo. banc 1982). "The fundamental rule of constitutional construction is that courts must give effect to the intent of the people in adopting the amendment . . ." Barnes v. Bailey, 706 S.W.2d 25,28 (Mo. banc 1986). Similarly, "[t]he court must . . .' consider the purpose or goal of the statute and any relevant conditions existing at the time it was enacted." State v.White, 622 S.W.2d 939, 944 (Mo. banc 1981). Thus, in construing either constitutional or statutory provisions, the primary objective is to determine the purpose of those who adopted the measure and to give it effect.
The purpose behind the lottery amendment specifying that the legislature may authorize a "Missouri state" lottery is clarified by a recent discussion of the history of lotteries and lottery regulation. In Barnes, the Missouri Supreme Court noted that "[d]uring the late eighteenth and early nineteenth centuries, lotteries were commonplace." Barnes,706 S.W.2d at 30. While such lotteries were generally authorized by the state legislatures, the proceeds were often used to finance local public improvements or even to support purely private institutions.Id. Due to widespread evangelism, however, lotteries fell into disfavor and came to be regarded as a particular form of gambling meriting special prohibition. Id. Missouri, like most all other states, adopted laws banning lotteries. Id.
With the recent decline of federal funding for state and local programs, interest was revived in the use of lotteries as a source of revenue for states. However, no similar impetus arose to reinstate lotteries as a means of raising funds for private purposes. It is within this historical context that the voters of Missouri enacted Article III, Section 39(b), which authorized "a Missouri state lottery." Viewed from this perspective, the voters, in authorizing the legislature to enact a"state lottery" as opposed to "a lottery" or "lotteries," apparently intended to preclude the legislature from returning to past practices and authorizing lotteries for private as well as public beneficiaries.
Given this interpretation of the constitutional language, it follows that the same interpretation should be applied to the corresponding statutory references, since the apparent purpose of the legislature in enacting the state lottery statutes was to authorize precisely the same sort of lottery which the people intended to authorize in the lottery amendment. This intention can be found in Section 313.220, which authorizes the State Lottery Commission to:
 [P]romulgate such rules and regulations governing the establishment and operation of a state lottery as its deems necessary and desirable to fully implement the mandate of the people expressed in the approval of the lottery amendment to article III of the Missouri Constitution at the general election in November, 1984.
Thus, in adopting the lottery amendment's language through the use of the terms "Missouri state lottery" and "state lottery," the legislature apparently intended the same modification of the term "lottery" as that intended by the people. That is, that the lottery authorized be one which inured to the benefit of the State of Missouri.
Additional authority for the proposition that the State Lottery Commission may implement the proposed joint on-line game may be found in the definition of "lottery game". "Lottery game" or "game" is defined in Section 313.205(7), RSMo 1986, as:
 [A]ny procedure authorized by written rule of the commission whereby prizes are distributed among persons who have paid, or have unconditionally agreed to pay, for tickets or shares which provide the opportunity to win such prizes.
(Emphasis added.)
The use of the term "any" when modifying a noun, is to be construed to be "all-comprehensive, and is equivalent to `every'." State ex rel. Sayad v. Zych, 642 S.W.2d 907, 911
(Mo. banc 1982); Boone County Court, supra,631 S.W.2d at 325.
The State Lottery Commission must comply with the requirements of the Missouri Constitution and applicable state statutes when conducting the joint on-line game. These constitutional and statutory restrictions include, among others, the following:
(1) Of moneys received from the sale of Missouri state lottery tickets a maximum of forty-five percent shall be awarded as prizes, a maximum of ten percent shall pay all commissions, administration and promotion costs, and a minimum of forty-five percent shall be deposited in the state treasury to the credit of the general revenue fund. Article III, Section39(b) of the Missouri Constitution and Section 313.321, RSMo 1986.
(2) Advertising shall provide only statistical information setting forth the odds of winning and the average return on the dollar in prize money to the public and strict factual statements of (a) the time, date and place of conducting the lottery; (b) the prize structure; (c) the type of lottery game being conducted; (d) the price of tickets; and (e) the locations where tickets for the Missouri state lottery are sold. Advertising shall not be designed to induce persons to participate in the lottery. Article III, Section 39(b) of the Missouri Constitution and Section 313.335, RSMo 1986.
CONCLUSION
It is the opinion of this office that the decision whether to enter into an agreement with other states for operation of a joint on-line game as discussed previously rests solely with the State Lottery Commission. Provided that the proposed joint on-line game complies with the restrictions in the Missouri Constitution and applicable state statutes, the State Lottery Commission is not foreclosed from participating in such multi-state game. These constitutional and statutory restrictions include, among others, the following:
(1) Of moneys received from the sale of Missouri state lottery tickets a maximum of forty-five percent shall be awarded as prizes, a maximum of ten percent shall pay all commissions, administration and promotion costs, and a minimum of forty-five percent shall be deposited in the state treasury to the credit of the general revenue fund.
(2) Advertising shall provide only statistical information setting forth the odds of winning and the average return on the dollar in prize money to the public and strict factual statements of (a) the time, date and place of conducting the lottery; (b) the prize structure; (c) the type of lottery game being conducted; (d) the price of tickets; and (e) the locations where tickets for the Missouri state lottery are sold. Advertising shall not be designed to induce persons to participate in the lottery.
Very truly yours,
 WILLIAM L. WEBSTER Attorney General